UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHRISTOPHER R. PIEDICI,

               Plaintiff,                       **DECISION AND ORDER**

        v.                              6:24-CV-06419 EAW CDH

ADDMAN ENGINEERING, INC.,

               Defendant.
_____

## INTRODUCTION

Plaintiff Christopher R. Piedici ("Plaintiff" or "Piedici") commenced this action against defendant ADDMAN Engineering, LLC ("Defendant" or "ADDMAN"), seeking the payment of a retention bonus following the end of Piedici's employment at ADDMAN. (Dkt. 1; Dkt. 21). Pending before the Court is a motion for summary judgment filed by Defendant. (Dkt. 28). For the reasons set forth below, Defendant's motion is granted in part and denied in part.

## BACKGROUND

### I.   **Factual Background**

The following facts are taken from Defendant's Statement of Undisputed Facts (Dkt. 28-3), Plaintiff's Response to Defendant's Statement of Undisputed Facts (in which he takes issue with only three statements) (Dkt. 30-1), and the exhibits submitted by both parties. The Court has noted the relevant factual disputes.

In or around January 2020, Piedici was hired by owner Bob Bechtold ("Bechtold") as the Chief Operating Officer of HARBEC, Inc. ("HARBEC"). (Dkt. 28-3 at ¶ 2). Piedici assumed the role of General Manager at HARBEC and was tasked with preparing the business to be sold. (*Id.* at ¶ 3). ADDMAN acquired HARBEC on November 1, 2022, and Piedici was retained as a key manager of ADDMAN. (*Id.* at ¶¶ 5-6). ADDMAN also employed many of Bechtold's family members. (*Id.* at ¶ 7).

In October 2022, ADDMAN presented Piedici with a letter regarding retention and performance incentives (the "Incentive Letter"). (*Id.* at ¶ 8). As relevant, the Incentive Letter contained the following clauses:

> To compensate you for your continuing efforts in leading the HARBEC team and integrating the team into ADDMAN, the company will pay you a $50,000 retention bonus if you remain employed through December 31, 2023. . . . To be eligible to receive the retention bonus, you must (i) remain actively employed by ADDMAN on December 31, 2023 and (ii) continue to perform your work duties as they may change from time to time through that date. The retention bonus will be paid within 30 days of the retention date. For avoidance of doubt, if, prior to December 31, 2023, your employment terminates for any reason other than an involuntary layoff by the company, you will not be eligible to receive the retention bonus.

(Dkt. 28-2 at 55; Dkt. 28-3 at ¶¶ 9-10). The Incentive Letter contained signature lines for ADDMAN Chief People Officer Michael Albright ("Albright") and Piedici. (Dkt. 28-2 at 55; Dkt. 28-3 at ¶ 11).

On October 24, 2022, Piedici requested a Microsoft Word version of the Incentive Letter so that he could make changes. (Dkt. 28-2 at 53-54). Albright sent that document on October 25, 2022, and instructed Piedici to "track [his] proposed changes and send it back for our consideration / response." (*Id.* at 53). Piedici sent his redlined document to

Albright and ADDMAN Chief Executive Officer Joseph Calmese ("Calmese") on November 6, 2022. (*Id.* at 58; Dkt. 28-3 at ¶ 12). Piedici added the following language: "The retention bonus will be earned for each month of work completed and fully vest at a pro-rata portion of the bonus calculated on a 12 month basis." (Dkt. 28-2 at 61; Dkt. 28-3 at ¶ 12). On November 18, 2022, Albright rejected Piedici's proposal and responded: "For your retention / performance bonus letter, please note that we are good with the language as originally drafted. . . . Please sign and return the attached letter." (Dkt. 28-2 at 64; Dkt. 28-3 at ¶ 13).

Piedici responded in the email chain on November 22, 2022, but his email did not address the Incentive Letter, nor did it contain a signed version. (Dkt. 28-2 at 70). Piedici does not recall whether he ever signed the Incentive Letter and he is unable to produce a signed version. (Dkt. 28-3 at ¶ 14; Dkt. 30-2 at 16-17). According to Piedici, he had a telephone or in-person conversation with Albright in which Albright said that he did not need to sign and return the Incentive Letter because the terms contained therein were what ADDMAN agreed to and what would be in effect. (Dkt. 30-2 at 12, 21). Piedici has submitted the testimony of ADDMAN Human Resources Manager Todd Paterson ("Paterson"), who stated that other employees who received an Incentive Letter were not required to sign and return it to receive the retention bonus. (*Id.* at 23). Paterson himself was paid a retention bonus and did not sign an Incentive Letter. (*Id.* at 23).

In March 2023[1] ADDMAN was preparing a reduction in force ("RIF") consisting of certain employees who joined ADDMAN through the HARBEC acquisition. (Dkt. 28-3 at ¶ 16). Paterson told Piedici about the layoffs and sent him a list of employees who were being considered. (*Id.* at ¶ 17; Dkt. 28-2 at 21-22). Piedici then told Bechtold that the following week, ADDMAN planned to carry out the RIF. (Dkt. 28-3 at ¶ 18; Dkt. 28-2 at 24). Piedici did not tell Bechtold which employees were on the RIF list. (Dkt. 28-2 at 24; Dkt. 30-2 at 6). According to Piedici, he was not aware that he was breaking confidentiality by informing Bechtold about the planned layoffs because no one told him that the information was confidential, and he thought Bechtold would have known because Bechtold "was aware of everything happening inside" the company. (Dkt. 30-2 at 5). Piedici did not agree with ADDMAN's decision to lay off employees. (Dkt. 28-3 at ¶ 20; Dkt. 28-2 at 32).

Bechtold discussed the RIF with other employees, including members of his own family, causing "an employer relations nightmare." (Dkt. 28-3 at ¶¶ 22-23; Dkt. 28-2 at 38-40). ADDMAN had to postpone the RIF and was unable to carry it out until weeks later. (Dkt. 28-3 at ¶ 24; Dkt. 28-2 at 38-40).

On March 22, 2023, Calmese learned that Piedici told Bechtold about the RIF. (Dkt. 28-3 at ¶ 25). The next day, Calmese spoke to Piedici. (*Id.*). According to ADDMAN, Piedici acknowledged improperly sharing the information, acknowledged that doing so was unacceptable, and apologized. (*Id.* at ¶ 26; Dkt. 28-2 at 49). Piedici agrees that he

---

[1]    Although ADDMAN's Statement of Undisputed Facts says that the RIF was planned in March 2022, that appears to be a typographical error. (*See* Dkt. 28-2 at 48).

acknowledged that he told Bechtold about the RIF but disputes that he admitted to any misconduct.  (Dkt. 30-1 at ¶ 2; Dkt. 30-2 at 18-19).  According to Piedici, Calmese "went off on a rant" about Piedici's behavior and told Piedici to send him a list of employees who he would recommend laying off, which Piedici did.  (Dkt. 30-1 at ¶ 2; Dkt. 30-2 at 18-19).

On March 27, 2023, Piedici received a letter from Calmese stating as follows: "Your employment is being terminated effective immediately for breaching your duty of loyalty and inappropriately sharing confidential information to thwart or undermine an Executive Leadership Team decision that you didn't support."  (Dkt. 28-3 at ¶ 27; Dkt. 28-2 at 74). According to Calmese, Piedici "was not laid off.  He was terminated."  (Dkt. 28-2 at 51). There were no previous plans to fire Piedici because he "did not have performance issues" and was a leader of the company.  (*Id.* at 50; Dkt. 28-3 at ¶ 28).  Terminating Piedici negatively affected ADDMAN because they had to scramble to find someone to fill Piedici's position.  (Dkt. 28-3 at ¶ 29; Dkt. 28-2 at 50).  Piedici contends that he was not told why he was let go and that though the termination letter said he had shared confidential information, Piedici was not informed what the information was.  (Dkt. 30-2 at 7-9).

## II.    **Procedural Background**

On June 17, 2024, Piedici filed this action against ADDMAN in Monroe County Supreme Court, claiming breach of contract, violation of New York Labor Law ("NYLL") § 191, and quantum meruit.  (Dkt. 1 at 10-12).  ADDMAN removed the case to federal court based on diversity jurisdiction.  (*Id.* at 1-4).  On September 26, 2024, Piedici filed an amended complaint (Dkt. 21) to which ADDMAN answered and asserted counterclaims for breach of fiduciary duty and violation of the faithless servant doctrine (Dkt. 22 at 10-

12).  ADDMAN filed the instant motion on March 19, 2025, seeking summary judgment on Piedici's claims only.  (Dkt. 28).  Piedici filed opposition papers (Dkt. 30) and ADDMAN replied (Dkt. 31).

## DISCUSSION

**I**.    **Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial."  *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs., Inc.*,

781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).    Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358.    Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.    <u>Breach of Contract</u>

ADDMAN submits that it is entitled to summary judgment on Piedici's breach of contract claim for two reasons.    First, ADDMAN contends that the Incentive Letter did not create an enforceable contract because there is no evidence that Piedici ever accepted its offer.    (Dkt. 28-1 at 8-9).    Because Piedici has no recollection of signing the Incentive Letter and admitted that it was never "finalized," ADDMAN submits that no contract was formed regarding a retention bonus.    (*Id.*).    Second, ADDMAN contends that even if the Incentive Letter may serve as an enforceable contract, Piedici cannot establish that ADDMAN breached the agreement because Piedici was terminated for cause.    (*Id.* at 9-10).    Because it is undisputed that the Incentive Letter stated that Piedici was not eligible for the retention bonus if he was no longer employed at ADDMAN on December 31, 2023 for any reason other than an "involuntary layoff," ADDMAN submits that Piedici cannot demonstrate entitlement to the bonus after he was terminated for disclosing confidential information.    (*Id.*).

- 7 -

Piedici responds that there is an issue of fact whether he accepted the terms of the Incentive Letter and thereby created an enforceable contract.  (Dkt. 30 at 4-6).  Piedici contends that because he was informed by Albright that signing the Incentive Letter was optional and that the terms of the letter would be in effect whether he signed it or not, and because Paterson stated that signatures for retention bonuses were not required for other employees, the Incentive Letter constituted an enforceable contract.  (*Id.* at 4-5).  On the second issue, Piedici responds that the language "involuntary layoff" in the Incentive Letter "unambiguously means an involuntary separation from employment[.]"  (*Id.* at 3-4).  Piedici submits that since he was removed from his position against his wishes, he experienced an involuntary layoff and is therefore entitled to payment of the retention bonus.  (*Id.*).  In the alternative, Piedici contends that the term "involuntary layoff" is ambiguous and should be construed against the drafter.  (*Id.* at 4).

## A. There is a question of fact whether the parties entered into an enforceable contract.

"To succeed on a claim for breach of contract under New York law, a plaintiff must demonstrate '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  *Roelcke v. Zip Aviation, LLC*, 571 F. Supp. 3d 214, 229 (S.D.N.Y. 2021) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).[2]  "It is a

---

[2]    Although not addressed by either party, the Court analyzes the breach of contract claim under New York law, particularly in light of the parties' exclusive citation to cases that apply New York contract law.  *See Carlyle Aviation Mgmt. Ltd. v. Frontier Airlines, Inc.*, 711 F. Supp. 3d 225, 236 n.7 (S.D.N.Y. 2024) ("The parties have exclusively

basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) (citing *Express Indus. and Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 854, 589 (1999)). "The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Id.* (citing *Joseph Martin, Jr., Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981)) (further citation omitted). "The manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which *evinces the intention of the parties to contract.*" *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (emphasis in original) (quoting *Maffea v. Ippolito*, 247 A.D.2d 366, 367 (N.Y. App. Div. 1998)). "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Starke*, 913 F.3d at 289 (citation omitted).

"Under New York law, whether a binding agreement exists" is generally a legal question for the court to decide. *See Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008). Where the parties' intention to form a contract is discernible by written agreements alone, "the question is one of law, appropriately decided . . . on a motion for summary judgment." *Mallad Constr. Corp. v. Cnty. Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 344 (1973). That said, a factual question arises when the parties' intent cannot be conclusively determined as a matter of law from the terms of the agreement itself. *See id.* ("Only where

---

discussed the claim for breach of contract under New York law. . . . The Court 'follow[s] their lead' and applies New York law here." (citations omitted)).

the intent must be determined by disputed evidence or inferences outside the written words of the instrument is a question of fact presented."); *see also Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989) (noting that a "factual question arises when intent cannot be determined from [the relevant] agreement") (citing *Enercomp, Inc. v. McCorhill Publishing, Inc.*, 873 F.2d 536, 546 (2d Cir. 1989)).  To answer that question, the factfinder considers "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *See Brown Bros. Elec. Contractors v. Beam Const. Corp.*, 41 N.Y.2d 397, 399 (1977).

Here, because ADDMAN rejected Piedici's proposed revisions to the Incentive Letter and there is no proof that the Incentive Letter was ultimately signed, there are factual questions precluding the Court's resolution whether the terms of the original Incentive Letter formed an enforceable contract between Piedici and ADDMAN.  Piedici presented testimony that he had a conversation with Albright in which Albright represented that Piedici was not required to sign the Incentive Letter for it to be in effect and that the terms of the Incentive Letter were accepted by ADDMAN.  (Dkt. 30-2 at 12, 21).  Furthermore, Piedici submitted the testimony of an ADDMAN human resources worker who stated that other employees who were sent an Incentive Letter were not required to sign and return it to receive the retention bonus, and that the human resources worker himself was paid a retention bonus and did not sign his Incentive Letter.  (*Id.* at 23).  A reasonable jury presented with that information and who credited Piedici's version of events could therefore determine that ADDMAN and Piedici evinced an intent to be bound by the terms of the Incentive Letter even without it being signed.  Thus, whether the parties mutually

assented to the Incentive Letter and correspondingly created an enforceable contract hinges on issues of credibility that cannot properly be resolved on a motion for summary judgment.

### B. There is a question of fact whether ADDMAN breached the terms of the Incentive Letter.

Under New York law,

> [a] contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion. Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity.

*Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569-70 (2002) (quotations and citations omitted). "Whether a contract is ambiguous is a question of law for the court, determined by 'looking within the four corners of the document, not to outside sources.'" *Cascades, Inc. v. Experis Fin. US, LLC*, No. 12-CV-851-JTC, 2014 WL 3891630, at *5 (W.D.N.Y. Aug. 7, 2014) (quoting *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998)). "'The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.' Thus, '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'" *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 360-61 (S.D.N.Y. 2016) (quoting *Greenfield*, 98 N.Y.2d at 569). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation, . . . unless each is a reasonable interpretation." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (quotations and citations omitted). "Thus, the court should not find

the contract ambiguous where the interpretation urged by one party would 'strain[ ] the contract language beyond its reasonable and ordinary meaning.'" *Id.* (alteration in original) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 459 (1957)). "When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *South Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.,* 4 N.Y.3d 272, 277 (2005)).

Here, the condition precedent to payment of the retention bonus was employment through December 31, 2023, unless terminated earlier by reason of "involuntary layoff by the company." A layoff encompasses a reduction in staff for a reason other than the employees' conduct. *See, e.g., Staley v. Hotel 57 Servs., LLC*, 680 F. Supp. 3d 440, 444 (S.D.N.Y. 2023) (defining "permanent layoff" as "the permanent termination of an employee for reasons unrelated to the employee's performance"); *Rusis v. Int'l Bus. Machs. Corp.*, 529 F. Supp. 3d 178, 217 (S.D.N.Y. 2021) ("'[L]ayoffs,' both colloquially and in technical legal use, almost always describe reductions in force . . . in which a group of employees are selected in bulk for separation."). ADDMAN cites to Black's Law Dictionary (12th ed. 2024), which defines "layoff," also termed a "reduction in force," as "[t]he termination of employment at the employer's instigation, usu[ally] through no fault of the employee; esp., the termination—either temporary or permanent—of many employees in a short time for financial reasons."

The Court does not find Piedici's contention that the phrase involuntary layoff "unambiguously means an involuntary separation from employment" no matter the reason,

to be a reasonable construction of the Incentive Letter's terms. To suggest that ADDMAN intended to award a retention bonus to anyone who was involuntarily separated from employment stretches the phrase beyond plausible interpretation. A retention bonus is intended to provide a monetary incentive to employees for maintaining employment. The Incentive Letter carved out an exception in the event that the employee was the subject of an "involuntary layoff"—in other words, through no fault of the employee, there was a termination of employment. But it is nonsensical to suggest that the purpose of the Incentive Letter would be served by awarding a bonus to an employee who did not remain employed through December 31, 2023, because of the employee's conduct—whether because the employee quit, retired, or was terminated for cause. Under the logic of Piedici's interpretation, any employee who received the Incentive Letter could take action to justify their termination for cause, yet they would still be entitled to payment of the bonus. Taken to its logical extreme, an employee could steal from the company the day after the Incentive Letter went into effect and be immediately terminated, and yet the employee would be entitled to the retention bonus. Piedici's definition would require ADDMAN to award employees fired for wrongful conduct with a bonus that was intended to reward employees for lasting employment. Such a contradictory result renders Piedici's interpretation unreasonable. *Pro. Fighters League, LLC v. Takeover Indus., Inc.*, 770 F. Supp. 3d 718, 723-24 (S.D.N.Y. 2025) ("It is a well-settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." (citation modified)).

In support of his definition, Piedici relies on the New York State Worker Adjustment and Retraining Notification ("NY WARN") Act, which, according to Piedici, defines layoff as "the last day an employee is eligible or permitted to work for their employer." (Dkt. 30 at 3-4 (citing 12 N.Y.C.R.R. § 921-1.1(c))). But that is a complete mischaracterization of that section, which clearly states that it is defining the term "[d]ate of layoff," not layoff alone. Piedici also contends that because the NY WARN Act utilizes the term "involuntary *mass* layoff" instead of "involuntary layoff," the Incentive Letter was not referring to a reduction in force. The Court is unpersuaded by that argument for several reasons, including that an agreement for a retention bonus is not governed by the NY WARN Act, which, like its federal counterpart, was passed to give employees advance notice of a mass layoff, not to regulate the award of a retention bonus. *See Roberts v. Genting N.Y. LLC*, 68 F.4th 81, 89-92 (2d Cir. 2023); *U.S. Bank Nat'l Ass'n v. DCCA, LLC*, 231 A.D.3d 765, 770-71 (N.Y. App. Div. 2024). In the Court's view, the NY WARN Act, rather than supporting Piedici's interpretation, only provides further support that a termination for cause is not a layoff, as the Act states that it does not apply to those terminations, thus delineating between the two events. (*See* 12 N.Y.C.R.R. § 921-1.1(f) (excluding discharge for cause, voluntary departure, and retirement, from employment termination constituting employment loss)). Moreover, Piedici acknowledged in his own deposition that a layoff and termination are distinct concepts by stating that he previously had to terminate employees but never had to "do a layoff[.]" (Dkt. 28-2 at 25). To now conflate the two terms in order to bolster his argument in opposition to ADDMAN's motion is unpersuasive.

- 14 -

Here, it is clear that Piedici's employment was not terminated as the result of a reduction in force. ADDMAN submitted proof that in March 2023, Piedici learned about ADDMAN's plan to lay off employees and then shared that information with Bechtold; on March 22, 2023, Calmese learned that Piedici informed Bechtold about the layoffs; on March 23, 2023, Piedici admitted to Calmese that he shared the information with Bechtold; and on March 27, 2023, Piedici received a letter stating that his "employment is being terminated effective immediately for breaching [his] duty of loyalty and inappropriately sharing confidential information to thwart or undermine an Executive Leadership Team decision that [he] didn't support." In addition, Calmese testified that Piedici "was not laid off. He was terminated." (Dkt. 28-2 at 51). Thus, the evidence establishes that within days of learning that Piedici shared allegedly confidential information, ADDMAN's CEO terminated Piedici's employment.

What is less clear, however, is whether Piedici was terminated with or without cause, and, assuming the absence of good cause, whether he was then entitled to the disbursement of a retention bonus according to the terms of the Incentive Letter. The Court is unconvinced by ADDMAN's liberal interpretation of the retention clause, which ADDMAN construes as meaning that Plaintiff would not receive a retention bonus if he was terminated for any reason prior to December 31, 2023, unless the termination was by a reduction in force. (Dkt. 28-1 at 9). Under that reading, ADDMAN could terminate Piedici for any reason—including an unlawful one—and yet Piedici would have no right to collect a retention bonus. Furthermore, that construction would have entitled ADDMAN to exercise its unfettered discretion and terminate Piedici mere hours before December 31,

2023, enabling ADDMAN to keep its $50,000 despite Piedici's almost complete satisfaction of the Incentive Letter's terms. The Court therefore rejects ADDMAN's proffered interpretation and determines that because the Incentive Letter is silent about its applicability to a termination without cause, there is ambiguity that cannot be resolved on this motion regarding whether an employee terminated in the absence of good cause has a valid claim to a retention bonus.

Importantly, the Court finds that Piedici has raised an issue of fact whether he was terminated for cause. To be certain, the termination letter, with which Piedici has not disputed the validity (Dkt. 30-2 at 9), stated that Piedici was terminated for "breaching [his] duty of loyalty and inappropriately sharing confidential information to thwart or undermine an Executive Leadership Team decision that [he] didn't support." Thus, according to ADDMAN, Piedici was terminated for informing Bechtold about the planned RIF. But the Court is not constrained by ADDMAN's stated justification for the termination. In other words, just because ADDMAN asserted that the information about the RIF was to be kept confidential from all other employees does not mean that it actually was, or that Piedici knew that it was. In Piedici's deposition, he insisted that he was unaware that he was sharing confidential information by telling Bechtold about the planned layoffs because no one told him that the information was confidential. (*Id.* at 4-5). In addition, the record is unclear about Bechtold's role in ADDMAN once it acquired HARBEC. If established that Bechtold was, for example, in a leadership position at ADDMAN, then a reasonable jury could conclude that Piedici was within his rights to communicate information that would affect the company as a whole to another manager, particularly if the jury believed Piedici's

assertion that he thought Bechtold already knew about the RIF because Bechtold "was aware of everything happening inside" the company. (*Id.* at 5). If it was determined that Piedici did not know that the information was not to be shared with anyone else, or that it was reasonable for Piedici to believe that Bechtold already knew about the RIF, then a jury may find that Piedici was terminated without cause. And whether an employee terminated without cause is barred from receiving a retention bonus under the Incentive Letter cannot be conclusively decided based on the record before the Court.

Accordingly, because Piedici has demonstrated issues of fact whether there is an enforceable contract and whether he was terminated for cause, the Court cannot resolve his breach of contract claim as a matter of law. ADDMAN's motion for summary judgment on this claim is denied.

## III.    <u>NYLL Section 191</u>

ADDMAN makes similar arguments in support of its motion for summary judgment on Piedici's claim alleging a violation of NYLL § 191. ADDMAN contends that Piedici "cannot assert a statutory claim for wages under the Labor Law if he has no enforceable contractual right to those wages." (Dkt. 28-1 at 11 (quoting *Tierney v. Capricorn Inv'rs, L.P.*, 189 A.D.2d 629, 632 (N.Y. App. Div. 1993))). ADDMAN further contends that even if the Incentive Letter did create an enforceable contract, Piedici did not remain employed at ADDMAN on December 31, 2023, nor was he the subject of an involuntary layoff, reflecting that Piedici did not satisfy the requirements that would entitle him to a retention bonus. (*Id.*).

Piedici alleges that by withholding his retention bonus, ADDMAN violated NYLL § 191(d)[3] by failing to pay his wages in accordance with the agreed terms of employment as prescribed in the Incentive Letter.  Piedici relies solely on *Ryan v. Kellogg Partners Institutional Servs.*, 19 N.Y.3d 1 (2012), and argues that because that case "demonstrates that a nondiscretionary bonus does not need to be in a formal contract to be binding, as long as it is a guaranteed and non-discretionary term of employment," Piedici is entitled to the payment of the retention bonus as owed wages under § 191.  (Dkt. 30 at 6-7).  The Court disagrees that *Ryan* is controlling in this case and finds that the NYLL claim fails as a matter of law.

NYLL § 191(d) dictates the frequency by which "clerical and other worker[s]" must be paid by their employer.[4]  The section prescribes that those workers "shall be paid the wages earned in accordance with the agreed terms of employment, but not less frequently than semi-monthly, on regular pay days designated in advance by the employer."  NYLL

---

[3]    Plaintiff has failed to identify, in both his amended complaint and opposition papers to the instant motion, the specific provision of § 191 on which he relies.  Nonetheless, because his complaint quotes language contained only in § 191(d) and Defendant has construed Plaintiff's amended complaint as asserting a violation of that subsection (*see* Dkt. 28-1 at 11), the Court addresses that subsection only.

[4]    Although not raised by Defendant, Plaintiff's position was not likely covered by § 191(d).  NYLL § 190(7) defines "Clerical and other worker" as any employee not covered by another subsection "except any person employed in a bona fide executive, administrative or professional capacity whose earnings are in excess of one thousand three hundred dollars a week."  The record does not contain proof of Plaintiff's weekly income, but considering that Calmese described Plaintiff's position at ADDMAN as a "general manager" and that Plaintiff was a "leader of [the] company" (Dkt. 28-2 at 50), his pay likely exceeded the threshold set forth in § 190(7).  *See Pachter v. Bernard Hodes Grp., Inc.*, 505 F.3d 129, 132 (2d Cir. 2007) ("Section 190 defines the . . . categories to exclude employees working in an executive capacity.").

§ 190(1) defines wages as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." The New York Court of Appeals has clarified that wages are not defined broadly under the NYLL, "to include every form of compensation paid to an employee, including bonuses" and in fact the NYLL definition excludes "incentive compensation 'based on factors falling outside the scope of the employee's actual work.'" *Truelove v. Ne. Cap. & Advisory, Inc.*, 95 N.Y.2d 220, 224 (2000).

In support of its motion for summary judgment, ADDMAN cites *Truelove*, addressing whether the plaintiff could recover the unpaid balance of a bonus he was awarded in December 1997 to be paid out in quarterly installments the next year following his resignation after the first bonus payment. The court rejected the plaintiff's argument that he was entitled to the remainder of the bonus payments because his compensation plan "did not predicate bonus payments upon plaintiff's own personal productivity" and was instead based "solely upon his employer's overall financial success" and "entirely discretionary[.]" *Id.* at 224. The court also determined that because "the bonus plan explicitly predicated the continuation of bonus payments upon the recipient's continued employment status," the plaintiff could not establish a NYLL violation. *Id.* at 226. ADDMAN therefore contends that because the Incentive Letter required Piedici to be employed at ADDMAN on December 31, 2023, Piedici was not entitled to receive the bonus payment after he was terminated for cause in March 2023. (Dkt. 28-1 at 11).

Although it is true that an "employee's entitlement to a bonus is governed by the terms of the employer's bonus plan[,]" *Hall v. United Parcel Serv. of Am., Inc.*, 76 N.Y.2d

- 19 -

27, 36 (1990), the New York Court of Appeals determined in *Ryan* that bonus payments expressly linked to an employee's services personally rendered that are earned and vested before an employee is terminated are owed to the employee under the NYLL, even if the employment agreement states that compensation and benefits are at will and can be terminated without cause at any time. *Ryan*, 19 N.Y.3d at 11. In that case, because the plaintiff's bonus was directly tied to his work as a broker and the bonus payment "was guaranteed and non-discretionary as a term and condition of his employment," his employer's failure to pay him his bonus after he was fired violated NYLL § 193. *Id.* Thus, *Ryan* stands for the principle that it is a violation of NYLL for an employer to neglect to pay a non-discretionary bonus premised solely on an employee's individual past performance once that bonus has been earned, even if the employee is no longer employed and the employment agreement conditioned receipt of the bonus on the employee's active employment status. *See Kolchins v. Evolution Mkts., Inc.*, 31 N.Y.3d 100, 110 (2018) ("To the extent the production bonus was not discretionary and, instead, was based only on plaintiff's performance as a manager during his final trimester of employment . . . the bonus could constitute nonforfeitable 'wages.' In that event, any provision of the [employment] agreement that would operate to deny plaintiff those wages after they were 'earned' based on the timing of payment would be void as against public policy under article 6 of the Labor Law.").

Thus, there is a distinction between cases like *Ryan* in which bonuses are conditioned on an employee's individual performance, and cases like *Truelove* where bonuses are centered on the performance of the company as a whole. *See O'Grady v.*

*BlueCrest Capital Mgmt. LLP*, 646 Fed. App'x 2, 4 (2d Cir. 2016) (comparing *Truelove* with *Ryan*).   "The consensus [in the Second Circuit] is that bonuses conditioned on individual performance constitute wages under the NYLL, while bonuses conditioned on group or company-wide performance do not." *Fischkoff v. Iovance Biotherapeutics, Inc.*, No. 17 Civ. 5041 (AT) (GWG), 2018 WL 4574890, at *4 (S.D.N.Y. July 5, 2018) (citing *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 416 (S.D.N.Y. 2011) (collecting cases)) (further citation omitted).   "Under this standard, bonuses offered as a means to attract or retain employees generally do not constitute wages, because such incentive payments do not typically depend on the employee's personal productivity." *Vekaria v. Mthree Corp. Consulting, Ltd.*, No. 22 Civ. 3197 (JPC), 2024 WL 4337542, at *6 (S.D.N.Y. Sept. 27, 2024) (citing *Beach v. HSBC Bank USA, N.A.*, No. 17cv5153, 2017 WL 5633162, at *3 (S.D.N.Y. Nov. 20, 2017) (explaining that compensation "predicated on [the employer's] efforts to induce, recruit, and retain" talent does not constitute wages under § 190(1)));  *Int'l Bus. Machs. Corp. v. Martson*, 37 F. Supp. 2d 613, 617 (S.D.N.Y. 1999) ("It has long been held that stock award plans . . . whose objectives are to retain talented executives by providing them with a proprietary interest in the growth and performance of the company, are not 'wages' under § 190 of the New York Labor Law."). In addition, where a bonus is conditioned "on an event that has not occurred, such as employment through a specific date," whether the bonus is a wage under the NYLL can be decided as a matter of law.  *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 416 (S.D.N.Y. 2011); *see Adler v. Solar Power, Inc.*, No. 16 CV 1635-LTS-GWG, 2018 WL 1626162, at *11 (S.D.N.Y. Mar. 30, 2018) ("To qualify as wages under NYLL, a bonus

or incentive must be earned by and vested in the employee."); *Guadalupe v. Tri-State Emp., Mgmt. & Consulting, Inc.*, No. 10-CV-3840 NG CLP, 2013 WL 4547242, at *10 (E.D.N.Y. Aug. 28, 2013) ("A bonus is earned when the employee acquires a vested interest in the award and its payment is not conditioned upon some occurrence or left to the discretion of the employer." (quotation modified)).

Here, it is undisputed that the bonus at issue is characterized as a retention bonus. Moreover, by the terms of the Incentive Letter, Piedici's receipt of the bonus was conditioned on his continued employment through December 31, 2023, and it was not predicated on his individual achievements beyond "continu[ing] to perform his work duties[.]" (Dkt. 28-2 at 55). In contrast, contained within the same Incentive Letter is a performance bonus that specifically conditioned Piedici's eligibility on his ability to achieve certain sales revenue figures. The latter clearly meets the standard for a bonus contingent upon individual performance, but that is not the bonus at issue here. All that was required of Piedici to maintain eligibility for the retention bonus was to continue doing his job at ADDMAN, i.e., to remain employed there from November 1, 2022, until December 31, 2023. Because Piedici's entitlement to the retention bonus was not linked to any individual achievement and therefore not "depend[ent] on [his] personal productivity," *Vekaria*, 2024 WL 4337542, at *6, the Court finds that Piedici has failed to establish that there is a question of fact whether Piedici's bonus constituted wages under the statutory definition of the NYLL. ADDMAN is entitled to summary judgment on this cause of action.

- 22 -

IV.    <u>**Quantum Meruit**</u>

ADDMAN contends that because the undisputed record shows that Piedici was paid his agreed upon salary for the duration of his employment and there is no evidence to dispute that the agreed upon salary was equal to the reasonable value of Piedici's services, ADDMAN is entitled to summary judgment on Piedici's quantum meruit claim.  (Dkt. 28-1 at 12-13).  In response, Piedici cites to statements made by members of ADDMAN who characterized Piedici as a "key manager" and said that Piedici's position was "so important."  (Dkt. 30 at 7).

 "In order to recover in quantum meruit under New York law, a claimant must establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."  *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (citation and internal quotation marks omitted).  "New York law does not permit recovery in quantum meruit, however, if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim."  *Id.* (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388 (1987)) (further citation omitted).

Here, because the Court is unable to determine as a matter of law whether an enforceable contract exists, it will not dismiss Piedici's sole mechanism for recovery in the event that a jury concludes the parties did not form a contract under the Incentive Letter.  Despite ADDMAN's contention that Piedici has proffered no evidence on the reasonable value of his services, the Incentive Letter itself may provide such proof.  *See, e.g., Zaitsev*

- 23 -

*v. Salomon Bros., Inc.*, 60 F.3d 1001, 1004 (2d Cir. 1995) (citing cases "in which the plaintiff was permitted to use the terms of an [unenforceable] contract to prove the reasonable value of services rendered"); *Johnson v. Robertson*, 131 A.D.3d 670, 672-73 (N.Y. App. Div. 2015) (unsigned agreement provided proof of reasonable value); *Frank v. Feiss*, 266 A.D.2d 825, 825 (N.Y. App. Div. 1999) ("Although there is no direct evidence of the reasonable value of the work performed, the parties' agreement furnishes evidence of such value."). Although to succeed on a theory of quantum meruit, Piedici will need to demonstrate that his salary has not already compensated him for the reasonable value of services rendered, *see KJ Roberts & Co., Inc. v. MDC Partners, Inc.*, 605 Fed. App'x 6, 7 (2d Cir. 2015) (summary order), that is an issue for trial. ADDMAN's motion for summary judgment is denied on this claim.

## CONCLUSION

For the reasons set forth above, the Court grants Defendant's motion for summary judgment (Dkt. 28) only on Plaintiff's claim alleging a violation of NYLL § 191. Defendant's motion for summary judgment is denied in all other respects.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      March 4, 2026
            Rochester, New York